NORMAN DAVIDSON, trustee in bankruptcy, *vs.* COMMONWEALTH.

Essex.    March 19, 1979. — October 31, 1979.

Present: ARMSTRONG, ROSE, & DREBEN, JJ.

*Eminent Domain,* Injury to property without taking, What constitutes taking, Right to damages. *Constitutional Law,* Police power. *Public Health.*

In an action under G. L. c. 79, § 10, by the owner of a nursing home seeking damages for an alleged taking of its property by the Commonwealth when, pursuant to the provisions of c. 17, § 2A, a public health emergency was declared to exist at the facility and the Department of Public Health undertook operation of the home, summary judgment for the defendant was appropriate where the plaintiff's allegations failed to show a genuine issue of material fact with respect to whether there was a "taking" for which the plaintiff was entitled to compensation and where the plaintiff failed to allege any facts which would support its claim that it had suffered damages as the result of the Commonwealth's action. [545-551]

CIVIL ACTION commenced in the Superior Court on September 29, 1976.

The case was heard on a motion to dismiss by *Ligotti,* J., a District Court judge sitting under statutory authority.

*Richard H. Gens* for the plaintiff.

*Elizabeth Bowen Donovan,* Assistant Attorney General, for the Commonwealth.

ROSE, J. The plaintiff[1] brought an action in the Superior Court seeking damages for an alleged taking of its property by the Commonwealth. The judge allowed the defendant's motion to dismiss the action (Mass.R.Civ.P. 12[b][6], 365 Mass. 755 [1974]),[2] and the plaintiff appealed. We affirm.

The relevant undisputed facts, taken from the complaint, exhibits appended thereto, and affidavits submitted by the parties in connection with the defendant's motion to dismiss, are as follows. On September 14, 1976, the Commissioner of Public Health (Commissioner) informed the Governor by letter that Woodland Nursing Home (Woodland) in Methuen (a facility owned and operated by the corporation represented by the plaintiff in this action) had announced that it would not guarantee payment to its staff after 3:00 P.M. on September 14, 1976, that families and relatives of certain patients at Woodland had been advised by the owners to remove the patients from the facility by the evening of September 14, and that the Department of Public Welfare could not make any emergency payments to Woodland. The Commissioner stated that removal of patients from Woodland would constitute an immediate danger to their health because of the lack of alternate nursing home facilities in

[1] The complaint was filed by Woodland Estates, Inc., owner of Woodland Nursing Home, on September 29, 1976. A petition in bankruptcy was filed by Woodland Estates, Inc., on January 5, 1977, and the above named trustee in bankruptcy was substituted as the plaintiff in this action on June 22, 1977.

[2] It appears that materials outside the complaint were brought to the judge's attention for purposes of the hearing on the defendant's motion to dismiss. These materials consisted of affidavits submitted by both parties to the judge and four exhibits attached to the complaint. The exhibits included a letter by the Commissioner of Public Health to the Governor, the Governor's declaration of emergency, and orders published by the Commissioner of Public Health. Since the judge did not exclude these materials, the motion is to be treated as one for summary judgment (Mass.R.Civ.P. 56[b], 365 Mass. 824 [1974]) under the provisions of Mass.R.Civ.P. 12(b), 365 Mass. 755-756 (1974). *Brookline* v. *Medical Area Serv. Corp., ante* 243, 245-246 & n.7.

the Methuen area and the fact that mortality of patients had been shown, in studies available to the Department of Public Health, to increase in the event of enforced transfer. The Commissioner requested the Governor to declare a public health emergency "so the Department of Public Health may take the necessary steps to provide care for the patients in the Woodland Nursing Home."

Pursuant to G. L. c. 17, § 2A, inserted by St. 1965, c. 473,[3] the Governor declared on September 14, 1976, that "an emergency exists which is detrimental to the public health at the Woodland Nursing Home in Methuen." Following the Governor's declaration, the Commissioner issued an order on the same day for the protection of patients at Woodland. The order provided that the Department of Public Health "is assuming responsibility for the care of the patients at the Woodland Nursing Home" and that employees of Woodland were to report for their regularly scheduled work shifts and "will be reimbursed by the Department . . . for services rendered at their usual rates of pay." The order also provided that the owners of Woodland were not to interfere with the access of any representative of the Department of Public Health to the home and were not to take any action to cause patients to be transferred from Woodland.[4] In an

---

[3] "Upon declaration by the governor that an emergency exists which is detrimental to the public health, the commissioner may, with the approval of the governor and the public health council, during such period of emergency, take such action and incur such liabilities as he may deem necessary to assure the maintenance of public health and the prevention of disease.

"The commissioner, with the approval of the public health council, may establish procedures to be followed during such emergency to insure the continuation of essential public health services and the enforcement of the same.

"Upon declaration by the governor that such emergency has terminated, all powers granted to and exercised by the commissioner under this section shall terminate."

[4] On September 16, 1976, the Department of Public Health appointed John R. Pratt as emergency supervisor of Woodland and the Department's representative. In an affidavit submitted to the judge the

order published on September 16, 1976, the Commissioner announced that the Commonwealth "will assure payment for all properly authorized supplies and services purchased for [Woodland] after 6:00 P.M., September 14, 1976."

In an affidavit submitted by the plaintiff in opposition to the defendant's motion to dismiss, the former president of Woodland alleged that on September 14, 1976, and prior thereto, patient care at Woodland, in spite of a shortage of funds, was adequate and uninterrupted, and that there was "no danger to the health and welfare of patients, thus no emergency situation existed on September 14 . . . ." He alleged that "[t]here was, as of August 17, 1976, a shortage of funds to the nursing home created by failure of the Commonwealth to pay for current services and monies owed, totalling $242,096.34" and that this shortage of funds precipitated actions by Woodland to reduce operating costs "by asking patients' relatives to take back wherever possible those patients who were medically capable of returning home and, to en[s]ure that all patients not medically capable of transfer be protected to the fullest by present staff, who agreed to stay on, and if necessary, with added hel[p]." The former president stated further that at no time did Woodland's owners consider moving patients whose health would be endangered by the trauma of transfer. Only patients in "Light Care Level III . . . not exposed to medical danger by transfer, were asked to return home."

Based on the events described above, the plaintiff brought this action for recovery of damages resulting from the "taking" of its property (including land, build-

Commissioner stated, "I intend to request termination of the public health emergency by the Governor upon appointment and qualification of a temporary receiver in this case.

". . . I have been informed that the U.S. Department of Housing and Urban Development (HUD) has been assigned Woodland's mortgage from the Brookline Savings Bank, has recorded same, and may commence foreclosure proceedings."

ings, equipment and all personal property) by the Commonwealth "pursuant to a Declaration of Emergency by the Governor ... and an order for the protection of patients by [the] Department of Public Health ...." The plaintiff claimed that it had received no compensation for the use of its property or for damages sustained as a result of the taking and had never been given an accounting by the Commonwealth concerning the property or the operation of the nursing home. After a hearing, the judge allowed the defendant's motion to dismiss and entered a judgment dismissing the action.

In reviewing the judge's action in the present case, we apply the standard that summary judgment "shall be rendered forthwith if the pleadings ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). We are mindful of the Supreme Judicial Court's approval of the use of summary procedures when clearly justified as "an excellent device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved." *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 553 (1976), quoting from 3 Barron & Holtzoff, Federal Practice and Procedure (Rules ed.) § 1231, at 96 (Wright rev. ed. 1958). After review of the materials before us, viewing the evidence in the light most favorable to the plaintiff, we conclude that the present case is an appropriate one for summary procedure.

The underlying issue is whether the action of the Commonwealth in taking over operation of Woodland during the pendency of a public health emergency declared by the Governor pursuant to G. L. c. 17, § 2A, constitutes a lawful exercise of the police power, as the Commonwealth contends, for which no compensation is required, or a taking of property requiring compensation, as the plaintiff claims. In order to determine whether the plaintiff

has a remedy under G. L. c. 79, §§ 10,[5] and 14,[6] authorizing recovery of damages for injury to property where there has been no formal taking of the property by the government, we must ascertain whether the allegations, in their aspect most favorable to the plaintiff, reveal a genuine issue as to whether the plaintiff's property has been "appropriated to public uses" so that "reasonable compensation therefor" must be provided under art. 10 of the Massachusetts Declaration of Rights.[7] *Sullivan* v. *Commonwealth,* 335 Mass. 619, 621 (1957).

---

[5] General Laws c. 79, § 10 provides in pertinent part:

"When the real estate of any person has been taken for the public use . . . or has been entered for a public purpose, but such taking, entry or damage was not effected by or in accordance with a formal vote . . . of a body politic . . . or when the personal property of any person has been damaged, seized, destroyed or used for a public purpose, and by such taking, damage, entry, seizure, destruction or use he has suffered an injury for which he is entitled to compensation, the damages therefor may be recovered under this chapter."

We note that c. 79, § 10, provides a remedy where there has been a taking or an injury for which the property owner is entitled to compensation, but that section does not of its own force create substantive rights. See *Sullivan* v. *Commonwealth,* 335 Mass. 619, 624-625 (1957); *Cayon* v. *Chicopee,* 360 Mass. 606, 608 (1971). The plaintiff has not called our attention to any other statutory provision entitling it to compensation in the circumstances of this case. Chapter 17, § 2A, does not, contrary to the plaintiff's argument on appeal, authorize compensation by the State for injury to property caused by actions taken by the Commissioner in accordance with the statute but merely authorizes the Commissioner to "take such action and incur such liabilities as he may deem necessary to assure the maintenance of public health."

[6] General Laws c. 79, § 14, provides in pertinent part:

"A person entitled to an award of his damages under this chapter . . . may petition for the assessment of such damages to the superior court of the county in which the property taken or injured was situated."

[7] Even if the Commonwealth's actions were to be viewed, arguendo, as an "entry" rather than a "taking," as those words are used in c. 79, § 10, the same test would apply in determining whether the plaintiff is entitled to compensation. In any event, the basis for the plaintiff's claim as contained in its complaint and affidavits is a "taking" of its property by the Commonwealth. For purposes of this appeal we make no distinction (nor does the plaintiff argue any) between the provisions

There is no dispute as to the facts regarding the sequence of events which led to the declaration of emergency; namely, that Woodland had announced that it would no longer guarantee payment to staff as of September 14, 1976, and that certain patients had been asked to leave. Based on the Commissioner's determinations that there were no alternative nursing home facilities available in the area and that the trauma of enforced transfer would be likely to endanger the lives and health of the patients, he requested the Governor to declare an emergency, and, following such declaration, the Department of Public Health took over operation of Woodland. The plaintiff's allegations that patient care up to and including September 14, 1976, despite a shortage of funds, was adequate; that only patients in light care level III who were medically capable of returning home were asked to leave, and that no patients were asked to leave whose health would be endangered by the trauma of transfer; that certain staff members had agreed to stay on (presumably without guaranty of pay) to provide care for remaining patients; and that on September 14 there was no danger to the patients' health and welfare, and thus no emergency at Woodland, do not raise "material" factual issues within the meaning of rule 56.[8] Even though we accept the plaintiff's allegations as true, we find that they have no bearing on the issue of whether the plaintiff is entitled to compensation for a "taking" of its property under G. L. c. 79, § 10.[9] The plaintiff has not challenged the constitu-

---

of the Massachusetts Declaration of Rights, art. 10, and the U.S. Constitution, amends. V and XIV.

[8] "A material issue is one which affects the outcome of the litigation." *Hahn* v. *Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).

[9] We note also that the plaintiff's allegations regarding the shortage of funds suffered by Woodland "created by failure of the Commonwealth to pay for current services and monies owed," which allegedly precipitated Woodland's attempts to reduce operating costs, do not raise issues germane to the inquiry before us. These allegations merely establish that the plaintiff had the right to avail itself of available

tionality of c. 17, § 2A, under which statute the emergency was declared by the Governor, or the validity of the Commissioner's actions undertaken in accordance with that statute.

We are of the opinion that the allegations set forth in the complaint, exhibits and affidavits do not disclose a "taking" for which compensation must be paid. The essential distinction between an exercise of the State's eminent domain power which is compensable and an exercise of the police power which is not is that in the exercise of eminent domain a property interest is taken from the owner and applied to the public use because such use is beneficial to the public, while in the exercise of the police power an owner's property interest is restricted or infringed upon to prevent its use in a manner detrimental to the public interest. See *Franco-Italian Packing Co.* v. *United States*, 128 F. Supp. 408, 414 (Ct. Cl. 1955); 1 Nichols, Eminent Domain § 1.42 (2), at 1-123 (rev. 3d ed. 1976). See also Sax, Takings and the Police Power, 74 Yale L.J. 36, 63 (1964). See generally Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165 (1967). To determine whether particular governmental actions have effected a taking, we must focus "on the character of the action and on the nature and extent of the interference with" the plaintiff's property rights. *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 130 (1978). See *Cayon* v. *Chicopee*, 360 Mass. 606, 611 (1971); *United States* v. *Causby*, 328 U.S. 256, 266 (1946); *Finks* v. *United States*, 395 F.2d 999, 1004 (Ct. Cl.), cert. denied, 393 U.S. 960 (1968).

The allegations in the materials before us fail to show a genuine, triable issue as to whether the plaintiff's prop-

remedies to recover the sums owed to it by the Commonwealth. See *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare*, 368 Mass. 15, 22, 30, cert. denied, 423 U.S. 929 (1975). See also *Community Natl. Bank* v. *Dawes, supra* at 559 & n.8; *Hahn* v. *Sargent, supra* at 464.

erty was "appropriated to public uses" by the Commonwealth within the meaning of art. 10 of the Declaration of Rights. Nowhere does the plaintiff allege that the Commonwealth appropriated Woodland's nursing home for its own use or exploitation. In its complaint the plaintiff states that the Commonwealth "did ... take the ... property of the Plaintiff ... pursuant to a Declaration of Emergency by the Governor ... and an order for the protection of patients by [the] Department of Public Health, all in accordance with [exhibit A]." In the Commissioner's order, attached to the complaint as part of exhibit A, he stated, "Pursuant to the declaration by the Governor ... that an emergency exists which is detrimental to the public health, I am taking the following action which I deem necessary to assure the protection of the health of the patients at Woodland. ... The Department of Public Health is assuming responsibility for the care of the patients at the Woodland Nursing Home. ..." The plaintiff's allegations show that the Commonwealth acted under authority of State law and the declaration of a public health emergency by the Governor to prevent a shutdown of Woodland and displacement of patients, exercising its sovereign powers to maintain the public health. See *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 117 (1922); *Commonwealth* v. *Hudson*, 315 Mass. 335, 339-342 (1943); *Mugler* v. *Kansas*, 123 U.S. 623, 668-669 (1887); *Miller* v. *Schoene*, 276 U.S. 272, 279-280 (1928); *Goldblatt* v. *Hempstead*, 369 U.S. 590, 592-596 (1962); *Franco-Italian Packing Co.* v. *United States, supra* at 414; *Finks* v. *United States, supra* at 1004. We believe that the Commonwealth's action in these circumstances constituted an exercise of the State's police power and a regulation of or a restriction upon the plaintiff's use of its property "to prevent the use thereof in a manner that is detrimental to the public interest." 1 Nichols, Eminent Domain, *supra* at 1-104.

The next phase of our analysis requires us to look at the nature and extent of the alleged interference with the

plaintiff's property rights. The plaintiff claims that through the Commonwealth's temporary occupation of Woodland, the plaintiff has been denied all beneficial enjoyment of its property and "all rights normally associated with the ownership of property," even though the plaintiff retained title to Woodland, and that even if the Commonwealth's officers believed their action was necessary because of an emergency situation at Woodland, compensation to the plaintiff is still required. It has been held in some cases that the regulation of property may cause such a deprivation of all practical uses of a landowner's property as to be the equivalent of a taking without compensation, and such a determination is said to depend upon the facts of the particular case. See *Commissioner of Natural Resources* v. *S. Volpe & Co.*, 349 Mass. 104, 107-108 (1965), and cases cited (remanded for further findings as to what uses the locus, subject to certain filling and dredging prohibitions under G. L. c. 130, § 27A, as then in effect, might still be put); *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 413-415 (1922) (commercial impracticability of mining certain coal due to operation of statute is tantamount to a "taking" of valuable property rights). Contrast *Miller* v. *Schoene*, 276 U.S. 272 (1928) (statute requiring destruction without compensation of red cedar trees infected by cedar rust to protect the State's apple orchards held constitutional as a proper exercise of the State's police power) in which the Court stated that "where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Id.* at 279-280.

In the present case the plaintiff has offered no facts whatsoever to substantiate the general allegation in its complaint that "[a]s a result of the taking . . . the Plaintiff has suffered a direct and proximate damage special and peculiar to it amounting to the actual taking of its property and resulting in the loss of its business." We point out

that in the event of a taking requiring compensation to a property owner, compensation ordinarily does not include damages for loss of business or good will. *Bailey* v. *Boston & Providence R.R.*, 182 Mass. 537, 539 (1903). *Connor* v. *Metropolitan Dist. Water Supply Commn.*, 314 Mass. 33, 41 (1943). Nor has the plaintiff alleged any facts which show diminution in value of its property or other injury resulting from the Commonwealth's action to support its claim that it has been deprived of all privileges of ownership for a period of time by the Commonwealth. We believe that these allegations are not sufficient to show a genuine issue of material fact from which a jury could reasonably find that interference with or restrictions on the use of the plaintiff's property occurring as a result of the Commonwealth's actions are of such magnitude or duration as to be the equivalent of a taking under the authorities cited above.

Based on the materials presented, we conclude that the plaintiff has not alleged specific facts sufficient to forestall the granting of summary judgment in favor of the defendant. As the court stated in *Community Natl. Bank* v. *Dawes, supra* at 554, "if the moving party [rule 56(b) ] shows that there is no issue for trial, the opposing party must respond and allege *specific facts* which establish that there is a genuine, triable issue, or summary judgment (if appropriate in all other respects) will be entered against him" (emphasis supplied).

*Judgment affirmed.*