392 Mass. 309 (1984)
467 N.E.2d 455
AMERICAN GRAIN PRODUCTS PROCESSING INSTITUTE
vs.
DEPARTMENT OF PUBLIC HEALTH & others.[1]
Supreme Judicial Court of Massachusetts, Suffolk.
February 13, 1984.
June 27, 1984.
Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.
Carl Valvo, Assistant Attorney General (Francis X. Bellotti, Attorney General, Joan C. Stoddard & Stephen S. Ostrach, Assistant Attorneys General, with him) for the defendants.
Thayer Fremont-Smith (Stuart M. Pape, of the District of Columbia, & Amos Hugh Scott with him) for the plaintiff.
Paul F. Colarulli, Pamela S. Horowitz, Stephen A. Brown, of the District of Columbia, & David J. Hatem, for Grocery Manufacturers of America, Inc., amicus curiae, submitted a brief.
LIACOS, J.
On February 14, 1984, this court issued the following order: "The plaintiff[[2]] contests the validity of the emergency regulation, promulgated by the Department of Public Health (department) on February 6, 1984, immediately banning the sale of food products containing ethylene dibromide (EDB) in the amount of 10 parts per billion (ppb) or greater, and, on and after March 7, 1984, banning the sale of food products containing EDB in excess of the amount of 1 ppb. 105 Code Mass. Regs. §§ 515.000 et seq. (1984). A complaint challenging the validity of this emergency regulation on various grounds was filed by the plaintiff in the Superior Court in Suffolk County on February 7, 1984. After hearing, a judge of the Superior Court issued an order on February 9, 1984, preliminarily enjoining the enforcement of the emergency regulation on the ground that the department lacked the power to set tolerances other than in conformity with federally-set tolerances. *311 See G.L.c. 94, § 192. The defendants sought relief from the single justice of this court pursuant to G.L.c. 231, § 118, and G.L.c. 211, § 4A. The single justice reserved and reported the matter, without decision, to the full court. Argument before the court occurred on Monday, February 13, 1984.
"On consideration of the record, memoranda, briefs, and oral argument of the parties, a majority of the court conclude as follows:
"1. General Laws c. 94, § 192, does not preclude the department from issuing the emergency regulation, 105 Code Mass. Regs. §§ 515.000 et seq. (1984).
"2. There is no showing on this record of a violation of the emergency standards set forth in G.L.c. 30A, § 2.
"3. On consideration of the plaintiff's affidavits and submissions in the record, we conclude that the plaintiff has not shown a substantial risk of irreparable harm since (a) the products involved are not perishable; (b) the department is required by G.L.c. 30A, § 2, to hold a public hearing at which all parties may be heard within ninety days of the date of the issuance of the emergency regulation (the court is informed at oral argument that such hearing will commence in the week of March 19, 1984); (c) the public interest has been found by the department to require such emergency action, and there is no showing that the department's decision was arbitrary, capricious, or in violation of law. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-618 (1980).
"4. Additionally, the plaintiff has not shown a likelihood of success in the litigation.
"Thus, a majority of the court concurring, the preliminary injunction of the Superior Court judge is vacated. A rescript will issue forthwith. An opinion or opinions will follow."
This opinion is given in explanation of that order.[3] General Laws c. 94, § 192, on which the Superior Court judge relied, provides that any standards, tolerances, and definitions of purity *312 or quality or identity for food which the department adopts shall conform to those adopted for the enforcement of Federal law.[4] The judge did not reach any of the other grounds on which the plaintiff challenged the regulation, nor did his memorandum discuss or compare the harm which would result from the issuance of the injunction to that which would result from its denial. However, "[j]urisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the [appellate court] without further trial court development." Packaging Indus. Group, Inc. v. Cheney, supra at 615 n. 9 (quoting 16 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 3921, at 17 [1977]). Having concluded that the question of the balance of harms and the other issues raised by the plaintiff had been illuminated sufficiently below to enable us to decide them, we did so without remanding the case for further hearing by the Superior Court judge. We address these issues in turn after discussing the ground of decision of the Superior Court judge.
1. The validity of 105 Code Mass. Regs. §§ 515.000 et seq. (1984) under G.L.c. 94, § 192. The challenged regulation provides for an "action level" for EDB in food. Any level of EDB in food lower than the action level is acceptable; in establishing action levels of 10 ppb and 1 ppb, 105 Code Mass. Regs. §§ 515.005 et seq. (1984) (the regulation) in effect established tolerances[5] for EDB of 9.99... ppb and .99... *313 ppb.[6] General Laws c. 94, § 192, mandates that any tolerance adopted by the department conform to the tolerance, if any, adopted for that substance under Federal law. In order to determine whether the regulation is valid under G.L.c. 94, § 192, therefore, it must be determined whether there is a Federal tolerance for EDB. The plaintiff does not point to any Federal regulation which explicitly sets a tolerance for EDB.[7] Rather, it argues that Federal law implicitly sets tolerances for EDB which are less stringent than those established by the department.
The plaintiff's first argument is based on a Federal regulation which states, "The organic bromide residues are exempted from the requirement of a tolerance for residues when the insecticide ethylene dibromide [EDB] is used as a fumigant after harvest for the following grains: Barley, corn, oats, popcorn, *314 rice, rye, sorghum (milo), wheat." 40 C.F.R. § 180.1006 (1983). EDB is an organic bromide; therefore "organic bromide residues," as used in § 180.1006, refers to residues of EDB. Thus, under the Federal scheme, residues of EDB are exempted from the requirement of a tolerance when EDB is used on these raw grains after harvest. The Superior Court judge's decision to grant the injunction was based on his view that this exemption from the requirement of a tolerance was equivalent to an infinite tolerance.[8] We disagree with the conclusion of the judge that an exemption is the equivalent of a tolerance. An exemption from the requirement of a tolerance is not itself a tolerance.[9] That such an exemption can be conceptualized as a statement of infinite tolerance does not mean that exemptions from tolerances are regarded as tolerances under the Federal *315 scheme. Both Federal and State law recognize that different meaning is to be given to the words "tolerance" and "exemption." See, e.g., 21 U.S.C. § 346a(a)(1) (1982) (authorizing tolerances), § 346a(a)(2) (authorizing exemptions from the requirement of a tolerance), § 346a(b) (providing for the promulgation of regulations establishing tolerances, including zero tolerances), and § 346a(c) (providing for the promulgation of regulations establishing exemptions); G.L.c. 94, § 182 (referring to exemptions and tolerances). Cf. G.L.c. 94, § 192 (containing no reference to exemptions).
We do not find persuasive the argument that the Massachusetts Legislature intended both "tolerances" and "exemptions from tolerances" to be understood from its use of the word "tolerances." To accept such an argument would be in contravention of the clearly expressed intention of the Legislature. If the Legislature had intended the department to be bound by a Federal decision not to set a standard, tolerance, or definition of purity, quality, or identity with respect to a particular substance, as well as by "standards, tolerances and definitions, if any," it would have said so. Cf. G.L.c. 94, § 182, as appearing in St. 1968, c. 467, § 14 (director of standards required to adopt the "variations, tolerances and exemptions" [emphasis supplied] established by act of Congress). The Legislature did not use similar words in G.L.c. 94, § 192, and we decline to imply language which it has omitted. Beeler v. Downey, 387 Mass. 609, 617 (1982). "[A] basic tenet of statutory construction is to give the words their plain meaning in light of the aim of the Legislature, and when the statute appears not to provide for an eventuality, there is no justification for judicial legislation." Commonwealth v. Vickey, 381 Mass. 762, 767 (1980).
The "aim of the Legislature" is evidenced by its action in amending G.L.c. 94, § 192, in June, 1948. St. 1948, c. 598, § 6. On March 9, 1948, the Attorney General had issued an opinion that it was the legislative intent that rules and regulations under § 192 should be for the purpose of implementing the Federal law referred to in § 192. Rep. A.G., Pub. Doc. No. 12, at 58 (1948). Specifically, he opined that the department *316 was not empowered to adopt rules and regulations with respect to subjects on which no Federal regulation had been adopted, nor to adopt a standard on a food for which no Federal standard had been established. The Legislature thereupon amended § 192 to delete the former requirement that the department's rules and regulations conform to Federal rules and regulations and to add the words "if any" after the reference to Federal "standards, tolerances and definitions."[10] Clearly, the amendment was intended to overrule the Attorney General's opinion. The section, as it now stands, must be interpreted to mean that the department may adopt a standard for a food for which no Federal standard has been established. We believe, furthermore, that the two changes in the section show the aim of the Legislature to require conformity only with Federal "standards, tolerances and definitions," and not with any other kind of rule or regulation.
Section 186 of G.L.c. 94, as amended through St. 1970, c. 891, §§ 2, 3, confirms our interpretation of the legislative intent behind § 192. "[W]here two or more statutes relate to the same subject matter, they should be construed together so as to constitute an harmonious whole consistent with the legislative purpose." Registrar of Motor Vehicles v. Board of Appeal on Motor Vehicle Liab. Policies & Bonds, 382 Mass. 580, 585 *317 (1981). General Laws c. 94, § 186, defines the conditions under which drugs, foods, cosmetics, and devices shall be deemed to be adulterated. It provides, in part, that food shall be deemed adulterated "if it is, in whole or in part, a raw agricultural commodity and such commodity bears or contains a pesticide chemical which is unsafe within the meaning of section 408 of the Federal Food, Drug and Cosmetic Act."[11] Section 186 also provides that food shall be deemed to be adulterated "if it bears or contains any food additive which is unsafe within the meaning of section 409 of the Federal Food, Drug and Cosmetic Act," or "if it bears or contains any color additive which is unsafe within the meaning of section 706 of the Federal Food, Drug and Cosmetic Act." However, the proviso follows in § 186 that an article which is not adulterated under these sections of Federal law "shall nevertheless be deemed adulterated if use of the pesticide chemical, food additive, or color additive in or on such article is prohibited by regulations of the department." This proviso indicates that the department may ban a particular pesticide chemical even though Federal law allows its use. In this respect the department may make decisions which do not conform to those made by Federal agencies.[12]
*318 The plaintiff's second argument that the regulation is in violation of G.L.c. 94, § 192, is that tolerances set under Federal law for inorganic bromide residues are equivalent to tolerances for residues of EDB, and that the tolerances set by the regulation do not conform to these Federal tolerances. 40 C.F.R. § 180.3(c)(2) (1983) is one of a group of definitional and interpretational regulations to be found at the beginning of Part 180 of Title 40. This Part consists of regulations relating to tolerances and exemptions from tolerances for pesticide chemicals in or on raw agricultural commodities. These regulations are issued by the Environmental Protection Agency (EPA). Section 180.3(c)(2) provides: "Where tolerances are established in terms of inorganic bromide residues only from use of organic bromide fumigants on raw agricultural commodities, such tolerances are sufficient to protect the public health and no additional concurrent tolerances for the organic pesticide chemicals from such use are necessary. This conclusion is based on evidence of the dissipation of the organic pesticide or its conversion to inorganic bromide residues in the food when ready to eat." Tolerances are set by § 180.146 for inorganic bromide residues from the use of EDB after harvest on raw agricultural commodities. Accordingly, § 180.1006, discussed above, exempts organic bromide residues from the requirement of a tolerance when EDB is used on raw grains after harvest.
Part 193 of Title 21 of the Code of Federal Regulations consists of regulations setting tolerances for pesticides in food. These regulations are issued by the Food and Drug Administration of the Department of Health and Human Services. The Part contains two regulations setting tolerances for inorganic bromide residues in milled grains and processed foods. See §§ 193.225(c) and 193.250. It contains no tolerances for EDB and, unlike Part 180 of Title 40, contains no exemption from the requirement of a tolerance for EDB. Nor is there a regulation in 21 C.F.R. § 193 (1983) comparable to 40 C.F.R. § 180.3(c)(2) (1983), establishing that tolerances for inorganic bromide residues serve as a substitute for tolerances for organic bromide residues. We assume for the sake of argument, however, that *319 the tolerances for inorganic bromide in 21 C.F.R. § 193 (1983) were prescribed under the same assumption as that expressed in 40 C.F.R. § 180.3(c)(2) (1983). The fact remains that inorganic bromide and ethylene dibromide, or EDB, are two different substances. Tolerances have been set under Federal law for inorganic bromide but, except on soybeans, not for EDB.[13] The plaintiff's counsel emphasized at oral argument before us that the relevant regulations in 40 C.F.R. § 180 (1983) and 21 C.F.R. § 193 (1983) form an integrated regulatory scheme. However, G.L.c. 94, § 192, requires the department to conform its standards, tolerances, and definitions of purity, quality, or identity to those adopted under Federal law, if any  not to make them consistent with an assumption on the basis of which a Federal agency may have declined to prescribe a tolerance for a substance.[14] Otherwise, the department would never be able to adopt a standard, tolerance, or definition where none had been adopted under Federal law. That it should be able to do so was the intent of the Legislature in passing the 1948 amendment discussed above.
At oral argument the plaintiff's counsel claimed that a tolerance for inorganic bromide is a tolerance for EDB not because organic pesticides convert to inorganic bromide residues in ready-to-eat food (see 40 C.F.R. § 180.3[c][2]), but because when food is tested, all organic bromide contained in it is broken down into inorganic bromide by burning. If this were true, the amount of EDB in a food would be limited by a tolerance for inorganic bromide in that food. Even so, it is questionable whether the tolerances for inorganic bromide in *320 21 C.F.R. § 193 could be regarded as tolerances for EDB, since none of them is a tolerance for inorganic bromide residues resulting from the use of EDB alone. Chemical pesticides other than EDB break down into inorganic bromide, and the regulations in Part 193 which set tolerances for inorganic bromide all mention as the source of the inorganic bromide at least one other such chemical pesticide in addition to EDB. We need not reach that question, however, since the plaintiff has failed to establish on the record that all EDB present in an article of food is broken down into inorganic bromide when a test is made on that article of food for inorganic bromide. That being so, regulation by the department of the amount of EDB in food has not been shown to be inconsistent with the Federal regulations establishing tolerances for inorganic bromide.
2. The applicability of G.L.c. 17, § 2A, to the adoption of the regulation. The department adopted the regulation on February 6, 1984, without notice or a public hearing, relying on § 2 of G.L.c. 30A, which allows an agency to dispense with such requirements in certain circumstances and to adopt an emergency regulation. The plaintiff contends that G.L.c. 17, § 2A, is inconsistent with G.L.c. 30A, § 2, and that, since G.L.c. 17 applies specifically to the Department of Public Health, § 2A supersedes the more general G.L.c. 30A, § 2, and governs the adoption of the regulation.
The plaintiff refers to the first paragraph of G.L.c. 17, § 2A, which is set forth in full in the margin,[15] and argues that *321 all emergency actions of the department directed toward the maintenance of public health and the prevention of disease must be taken pursuant to § 2A. It further argues that the adoption of the regulation is such an emergency action and that, since the Governor had not declared an emergency with respect to the presence of EDB in food, the regulation was adopted illegally.
The plaintiff cites Pereira v. New England LNG Co., 364 Mass. 109, 118 (1973), for what the plaintiff calls the "axiomatic rule of statutory construction that the terms of a statute of general application must yield to the terms of a statute of specific application." It fails to cite the qualification to this rule expressed in Pereira: that it applies "[i]f a general statute and a specific statute cannot be reconciled." Id. The two statutes which the plaintiff claims are inconsistent can be reconciled easily. General Laws c. 30A, § 2, allows the department[16] to exercise its authority under G.L.c. 94, § 192, to adopt regulations without fulfilling the requirement of § 192 of holding a public hearing. General Laws c. 17, § 2A, allows the Commissioner of Public Health, when the Governor has declared an emergency, to "take ... action and incur ... liabilities" to maintain public health and to prevent disease, as well as to establish procedures to ensure the continuation and enforcement of essential public health services. The only reported instance of the exercise of G.L.c. 17, § 2A, is the Commissioner's takeover in 1976 of the operation of Woodland Nursing Home in Methuen and his payment of its employees and suppliers. See Davidson v. Commonwealth, 8 Mass. App. Ct. 541, 543-544 (1979). We believe that it was this sort of expenditure and administrative action which § 2A was designed to allow.
The plaintiff elsewhere quotes to us the proposition that "[s]tatutes which do not necessarily conflict should be construed to have consistent directives so that both may be given effect." County Comm'rs of Middlesex County v. Superior *322 Court, 371 Mass. 456, 460 (1976). Accordingly, in the absence of any indication of legislative intent to the contrary,[17] we construe G.L.c. 17, § 2A, to have conferred on the Commissioner, in a declared emergency, powers which neither he nor the department previously possessed. We do not construe it to have transferred the power to adopt emergency regulations from the department to the Commissioner.[18] Nor do we construe it to have required a declaration of emergency for such regulations to be adopted where previously no such declaration was necessary and when other agencies are not so restricted. "It is settled that a statute `as a whole ought, if possible, to be so construed as to make it an effectual piece of legislation in harmony with common sense and sound reason,' Morrison v. Selectmen of Weymouth, 279 Mass. 486, 492 [1932]; Beloin v. Bullett, 310 Mass. 206, 210 [1941]; that it is to be interpreted in the light of the pre-existing state of the law and the main object to be accomplished, Acford v. Auditor of Cambridge, 300 Mass. 391, 395 [1938]; and that repeals by implication have never been favored by our law. Commonwealth v. Bloomberg, 302 Mass. 349, 352 [1939]." Johnson's Case, 318 Mass. 741, 746 (1945). We conclude that the department's adoption of the regulation was governed by G.L.c. 30A, § 2.
3. The validity of the regulation under G.L.c. 30A, § 2. General Laws c. 30A, § 2, as appearing in St. 1976, c. 459, § 2, allows an agency to dispense with notice and a hearing when they would otherwise be required[19] and to adopt a regulation as an emergency regulation "[i]f the agency finds that immediate adoption ... of a regulation is necessary for the preservation of the public health, safety or general welfare, and that observance of the requirements of notice and a public *323 hearing would be contrary to the public interest." The section further requires that "[t]he agency's finding and a brief statement of the reasons for its finding shall be incorporated in the emergency regulation as filed with the state secretary."
The department fulfilled this requirement in making its filing. It stated as its reasons for finding an emergency regulation necessary that "[t]he Department finds that consumption by the public of foods containing ethylene dibromide (EDB) in a concentration equal to or greater than the action level set forth in 105 CMR 515.005 poses an immediate and lasting threat to health. Further consumption of foods which contain ethylene dibromide in a concentration equal to or greater than the action level must be prevented or reduced to the greatest extent possible as soon as practicable."
The plaintiff claims that the regulation is invalid because the facts did not warrant its promulgation as an emergency regulation without notice and hearing.[20] The standard for deciding whether an agency's finding of an emergency under c. 30A was warranted is whether there was a "substantial basis" for it. Pioneer Liquor Mart, Inc. v. Alcoholic Beverages Control Comm'n, 350 Mass. 1, 10 (1965). Such a finding "is given every presumption in its favor and is not subject to question in judicial proceedings unless palpably wrong." Robinson v. Secretary of Admin., 12 Mass. App. Ct. 441, 450 (1981) (citing Prescott v. Secretary of the Commonwealth, 299 Mass. 191, 203 [1938]). It is impossible for us to say on this record that the department's finding lacked a substantial basis or was palpably wrong.
*324 The plaintiff does not dispute that EDB causes cancer, mutations, and reproductive dysfunctions in animals, or that the animal test data indicate that it is a health risk for humans also. Furthermore, the plaintiff recognizes that the soundness of the department's conclusion that an action level for EDB of 1 ppb is necessary to protect the public health is not at issue in this case.[21] In challenging the emergency regulation as unnecessary, the plaintiff (1) claims that EDB poses only a longterm risk, (2) points to the fact that the EPA recommended less stringent maximum permissible residue levels for EDB, and (3) contends that there was no discussion in the meeting of the Public Health Council before it adopted the regulation on February 6, 1984, as to whether an emergency existed. The plaintiff cites the Commissioner of the Department of Public Health's statement on February 1, 1984, that "the danger from this type of contamination is a long-term one of increased risk of cancer over a period of time."
The record reveals that, at the February 6 meeting of the Public Health Council, Dr. Stephen Havas, deputy commissioner of the department, presented to the Council the view of the department staff that there is no safe level of exposure for a cancer-causing agent; that only in the absence of the agent is there no increased risk; and that, since the amount of exposure is a product of both the amount of daily exposure and the length of time of exposure, both of those factors should be decreased. Dr. Havas also told the Council that "it's to some extent a matter of probability how many hits, as it were, of a *325 particular substance are needed before you get the genetic changes which will result in cancer or other adverse outcomes. Sometimes it will happen on a first hit, other times it would take 30 hits, as it were." The information presented by Dr. Havas constituted a substantial basis for the department's conclusion that an emergency regulation was necessary. It is irrelevant that the plaintiff or others may dispute that information. It is also irrelevant that the EPA recommended less stringent guidelines for EDB residues than the action level adopted by the department. The fact which bears on whether the department was warranted in adopting an emergency regulation is the fact that the Administrator of the EPA recommended guidelines for EDB residues in his February 3 emergency order rather than waiting for the EPA formally to adopt tolerances for EDB. See 49 Fed. Reg. 4455 (1983). The plaintiff's third argument, that there was no discussion of an emergency in the February 6 meeting, is frivolous. The presentation by various members of the staff and the questions and comments by the Council were all directed to the issue whether the emergency regulation proposed by the staff should be adopted.
4. The validity of the regulation under G.L.c. 30A, § 5. The plaintiff claims that the regulation is invalid because the fiscal effect statement filed by the department with the State Secretary did not fulfil the requirements of G.L.c. 30A, § 5, as amended through St. 1980, c. 329, § 28. This section requires that the regulations of each agency be filed with the State Secretary and provides that "[n]o rule or regulation so filed with the state secretary shall become effective until an estimate of its fiscal effect including that on the public and private sector, for its first and second year, and a projection over the first five-year period, or a statement of no fiscal effect has been filed with said state secretary." The department filed the following statement of fiscal effect: "This regulation will cause foods which are adulterated to be unsalable. The exact quantity and value of such foods is unable to be ascertained." We assume, arguendo, that this provision applies to the promulgation of emergency regulations.
*326 We believe that the fiscal effect statement filed by the department was adequate under the circumstances. To hold otherwise would be to hold that an emergency regulation, which an agency has deemed necessary for the preservation of the public health, safety, or general welfare, cannot take effect if the amount of its fiscal effect is unascertainable at the time of its adoption. We do not believe that the Legislature meant so to restrict the adoption of emergency regulations. Such regulations by definition are adopted quickly and without benefit of a public hearing, and a specific estimate of their fiscal effect often may not be possible at the time of their filing.[22] When a specific estimate of an emergency regulation's fiscal effect can be made, of course, it must be filed. The agency is to be held to a good faith standard in this regard. See Robinson v. Secretary of Admin., supra. Emergency regulations may not be used for the purpose of "evasion of the salutary purposes of c. 30A." Pioneer Liquor Mart, Inc. v. Alcoholic Beverages Control Comm'n, supra at 9. There is no such purpose of evasion demonstrated by this record.
5. The balance of harms. As mentioned above, the Superior Court judge who issued the order enjoining enforcement of the regulation apparently did not weigh the harm which would result from the issuane of the injunction against the harm which would result from its denial. In issuing our order of February 14, 1984, we decided the issue of the balance of harms, drawing our own conclusions from the record. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980).
Cheney, supra at 616-617, set out the standard for issuance of a preliminary injunction: "the moving party must show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits.... [W]hen asked to grant a preliminary injunction, the judge initially evaluates in combination the moving party's claim of injury and chance of success on the merits. If the *327 judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue" (footnotes omitted).
The plaintiff has failed to show either that it would be irreparably harmed should the injunction not issue, or that it is likely to succeed on the merits.[23] It has filed an affidavit stating that enforcement of the regulation would cause national economic disruption, on the assumption that large manufacturers of grain-based products would be forced, given the integrated method of distribution of those products, to conform them to the most stringent of the States' action levels for EDB residues, i.e., the Massachusetts action level. The affidavit also describes the rise in national consumer prices which would result as part of this national economic disruption, as well as the economic loss to manufacturers and the rise in consumer prices in Massachusetts which enforcement of the regulation would cause.[24] The affidavit does not, however, show "a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits." Cheney, supra at 616. In the context of a preliminary injunction, it is only the loss of such rights that is considered irreparable. Id. at 617 n. 11. It is irrelevant, therefore, what harm the plaintiff would suffer if the regulation were upheld *328 after trial. Nevertheless, the affidavit seems to be based on the premise of the permanent removal from the Massachusetts market of the products which do not conform to the regulation. This premise is faulty, since the regulation does not require the destruction of adulterated products, but merely forbids their distribution to Massachusetts consumers. None of the products found as of February 8, 1984, to be adulterated under the regulation is perishable, and nearly all of them have a shelf life of one to four years. They could be returned to the grocery shelf if the plaintiff were to prevail on the merits.[25] The plaintiff has not shown what irreparable economic loss its members would then have suffered. Similarly, the plaintiff has not shown why its members cannot continue to manufacture and distribute their products as they did before the adoption of the regulation, thus adding to the supplies which could be returned to the shelves if the plaintiff prevailed on the merits. Any national economic disruption could thereby be avoided. Finally, the plaintiff has not shown that consumer prices would rise either nationally or in Massachusetts if companies continued their former methods of manufacture and distribution, and if products were merely removed from grocery shelves pending the decision on the merits. Furthermore, no reason appears why the hearing on the merits could not have been consolidated with the preliminary injunction hearing pursuant to Mass. R. Civ. P. 65 (b) (2), 365 Mass. 832 (1974), thus minimizing the risk of irreparable harm to the plaintiff. See Cheney, supra at 616 n. 10. Cf. Mass. R. Civ. P. 56, 365 Mass. 824 (1974) (motion for summary judgment). In any event, the department was required to hold a public hearing within three months if the regulation was to continue in effect. G.L.c. 30A, § 2. Any harm arising from products being held off the shelves as a result of the failure of the department to hold a hearing before the adoption of the regulation would therefore be terminated within those three months.
*329 The second factor to be evaluated in the initial consideration of an application for a preliminary injunction is the likelihood of the moving party's success on the merits. Cheney, supra at 617. As discussed in the previous sections, the plaintiff's arguments that the regulation was adopted in contravention of G.L.c. 94, § 192; G.L.c. 17, § 2A; or G.L.c. 30A, §§ 2 or 5, lack merit. To the extent that the plaintiff is challenging the regulation as arbitrary and capricious, we believe that there is also no likelihood of success on the merits. A plaintiff challenging a regulation as arbitrary and capricious "has the burden of proving on the record `the absence of any conceivable ground upon which [the rule] may be upheld.'" Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 776 (1980) (quoting Colella v. State Racing Comm'n, 360 Mass. 152, 156 [1971]). See also Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 720-724, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936 (1983); American Family Life Assurance Co. v. Commissioner of Ins., 388 Mass. 468, 477-478, cert. denied, 464 U.S. 850 (1983). We have already said enough, in connection with the plaintiff's challenge under G.L.c. 30A, § 2, to show that the plaintiff cannot carry this burden.
Since the plaintiff has shown neither a substantial risk of irreparable harm nor the likelihood of its success on the merits, we need not evaluate the risk of irreparable harm to the public interest. See Brookline v. Goldstein, 388 Mass. 443, 447 (1983); Krebiozen Research Found. v. Beacon Press, Inc., 334 Mass. 86, 99, cert. denied, 352 U.S. 848 (1956).[26]
*330 LYNCH, J. (dissenting, with whom Nolan and O'Connor, JJ., join).
I dissent. We have before us an emergency regulation which, in effect, prohibits the sale of food products in Massachusetts after March 7, 1984, that contain more than 1 ppb of ethylene dibromide (EDB). The record establishes that EDB has been in use in the United States since 1948. After the National Cancer Institute determined in 1975 that EDB appeared to induce cancer in laboratory animals, the United States Environmental Protection Agency (EPA) began a review of the use of the chemical. After careful study the EPA announced on February 3, 1984, its recommendations as to safe and acceptable levels of EDB in grain based products. The levels set by the EPA were 150 times greater for products that require cooking and thirty times greater for ready to eat products than the levels set by the department without the opportunity for careful study and without a public hearing. The department justified its rush to judgment by its own determination that an "emergency" existed. The department's determination that local action, independent of the EPA, was required to address this "emergency" is apparently contrary to the views of the Governor, the administration of the EPA, and even the Commissioner of Public Health. It is also worth noting that, after promulgating this emergency regulation at a level of 1 ppb, the same department suggested to the EPA that the level should be not more than 50 ppb. 49 Fed. Reg. 17144 (April 23, 1984). The standard being imposed upon the industry by this regulation without any opportunity for rebuttal or defense should be put in perspective. Dr. Gordon W. Gribble, professor of chemistry at Dartmouth College is one who has done so. If there had been a public hearing he would have had the opportunity to make his views known that 1 ppb is "one inch in 16,000 miles, or roughly two-thirds of the distance around the earth. One ppb is one second in 33 years, or one minute in the time elapsed since the birth of Christ. One ppb is one penny in ten million dollars. One ppb is one teaspoon of fertilizer spread evenly over a garden of 5000 acres. One ppb is equivalent to four drops of water in a filled Olympic-sized pool (64,000 gallons). *331 Or, for those of you on a low-carbohydrate diet, one ppb is one crouton in a salad weighing 500 tons."[1]
Thus the emergency as perceived by the department is used to justify a hastily conceived standard originally 150 times more stringent than that imposed by the Federal agency that has studied the problem for approximately ten years. I believe for this court to follow such questionable action by the department is bad law and bad policy.
The regulations of administrative agencies in this Commonwealth are free from effective judicial review if, without any explanation, or demonstration on the record, there is "any conceivable ground upon which [the regulation] may be upheld." Colella v. State Racing Comm'n, 360 Mass. 152, 156 (1971). See American Family Life Assurance Co. v. Commissioner of Ins., 388 Mass. 468, 478 n. 6, cert. denied, 464 U.S. 850 (1983). The majority's decision today applies a similar standard of nonreview to the agency's determination that an "emergency" exists, whereupon regulations may be promulgated without a public hearing. G.L.c. 30A, § 2.[2]
*332 This court recognized in Pioneer Liquor Mart, Inc. v. Alcoholic Beverages Control Comm'n, 350 Mass. 1, 9 (1965), that "`emergency' findings under c. 30A must be carefully scrutinized because, if unwarrantably made, they may lead to improper denial of public hearings or comment on regulations, to evasion of the salutary purposes of c. 30A and possibly to other serious abuse."
The decision today is one more step toward agency nonaccountability and carte blanche, a process that has already gone too far. Given the importance of the right to participate in the rule making procedure, and given the broad economic implications of the department's action in this case, I feel that this court is obliged to look harder than it did at the department's declaration of emergency. I would not permit the department to avoid holding a public hearing as required by G.L.c. 30A, § 2, and G.L.c. 94, § 192, without a showing on the record that a threat to public health was serious and imminent.
Courts in other jurisdictions have used a stricter standard of review for determinations that an emergency exists, stricter than review of everyday agency action. See, e.g., American Fed'n of Gov't Employees v. Block, 655 F.2d 1153, 1157 n. 6 (D.C. Cir.1981) ("[E]mergency situations are indeed rare"); New Jersey v. United States Envtl. Protection Agency, 626 F.2d 1038, 1045 (D.C. Cir.1980) ("[J]udicial review of a rule promulgated under an exception to the [Administrative Procedure Act's] notice-and-comment requirement must be guided by Congress's expectation that such exceptions will be narrowly construed"); Senn Park Nursing Center v. Miller, 118 Ill. App.3d 733, 744 (1983) ("Although we agree with defendant that the existence of an emergency is primarily a matter for an agency's discretion ... courts are not conclusively bound by an agency's determination that an emergency exists.... The *333 importance of judicial scrutiny of administrative actions cannot be overemphasized"); Florida Home Builders Ass'n v. Division of Labor, 355 So.2d 1245, 1246 (Fla. Dist. Ct. App. 1978) (Agency's statement of emergency must be "factually explicit and persuasive concerning the existence of a genuine emergency"). See also, J.T. O'Reilly, Administrative Rulemaking 40 (1983) ("No agency is immune from tough judicial review, and the good cause exception is especially deserving of tough scrutiny").
The cases cited above stand for the principle that public participation is central to the rule making process. Since administrative officials are only tangentially responsive to the will of the people, and since the scope of judicial review of their decisions is greatly constricted, public participation is really the only imposition on an agency's free rein. Therefore, for the department to dispense with the requirement of notice and public hearing, the threat to the public health must be serious and imminent.
No such case is demonstrated here. The question is not whether the department could reasonably determine that EDB causes cancer. The question is whether the risk to the public health is so urgent that serious harm can only be avoided if immediate action is taken, without public participation. Such urgency is clearly not demonstrated on the record before us.
Since I would hold that no demonstrable emergency exists on this record, I would not reach the other issues decided by the majority.
NOTES
[1] The other defendants are the Public Health Council, its members, and the Commissioner of Public Health.
[2] The plaintiff's member companies are manufacturers and processors of grain-based food products sold throughout the United States.
[3] Reference is made in this opinion to Federal law as it stood at the time of the order. See 49 Fed. Reg. 17144-17150 (April 23, 1984) and 49 Fed. Reg. 13195-13196 (April 3, 1984) for recent changes in Federal law. Some of these changes are described in n. 7 below.
[4] The wording of G.L.c. 94, § 192, as amended through St. 1961, c. 600, § 8, is, in pertinent part: "The department of public health ..., after a public hearing, shall adopt and promulgate rules and regulations consistent with [§§ 186-195 of c. 94], and, except as to standards fixed by law, may adopt standards, tolerances and definitions of purity or quality or identity for articles of food, drugs or devices.... Such standards, tolerances and definitions shall conform to the standards, tolerances and definitions, if any, of purity or quality or identity adopted or that may hereafter be adopted for the enforcement of the federal food, drug and cosmetic act, approved June twenty-fifth, nineteen hundred and thirty-eight (Title 21, USC 301 et seq., 52 Stat. 1040 et seq.), or now or hereafter adopted for the enforcement of federal law."
[5] A tolerance, as the name suggests, is the maximum concentration of a substance allowed by law. See 21 U.S.C. § 346 (1982).
[6] Any concentration of EDB lower than 1 ppb is said to be undetectable.
[7] A Federal regulation has come to our attention since we issued our order of February 14. This regulation, which apparently escaped the notice of the parties, sets a tolerance for EDB in or on soybeans at .001 part per million (ppm). 40 C.F.R. § 180.397 (1983). We note that a tolerance of .001 ppm is equal to a tolerance of 1 ppb. Nevertheless, the department's action level is not quite in conformity with this Federal tolerance, since under the department's regulation food is adulterated if it contains 1 ppb of EDB, whereas under § 180.397, 1 ppb of EDB is tolerated on soybeans. However, the regulation fails to conform only in so far as it affects raw soybeans. See note 8, infra.

Recently 40 C.F.R. § 180.397 (1983) has been amended by the addition of a paragraph setting a tolerance of 900 ppb for residues of EDB on raw barley, corn, oats, popcorn, rice, rye, sorghum (milo), and wheat. 49 Fed. Reg. 17147 (April 23, 1984). Also, action levels for EDB for milled grain products and for finished (ready-to-eat) consumer products of 150 ppb and 30 ppb, respectively, have taken effect. 49 Fed. Reg. 13195-13196 (April 3, 1984). See 49 Fed. Reg. 17146 (April 23, 1984).
We also note that the department subsequently has issued new regulations for EDB tolerances. See 105 Code Mass. Regs. § 515.000 (May 8, 1984). The validity of the most recent State regulations is not before us, and, hence, we express no opinion on that issue. On May 21, 1984, the plaintiff suggested that the case is moot because the emergency regulation at issue has expired and because the department has promulgated new regulations concerning EDB. The case is not moot. It was resolved by our order of February 14, 1984. This opinion merely explains the reasons for that order. See Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 730, 735 (1977).
[8] Even if we assume that the exemption from the requirement of a tolerance found in 40 C.F.R. § 180.1006 (1983) is a tolerance, the judge's order enjoining the defendants from enforcing the State regulation was too broad. The exemption applies by its terms to EDB residues resulting from the use of EDB after harvest on raw barley, corn, oats, popcorn, rice, rye, sorghum (milo), and wheat. Under 21 U.S.C. § 342(a)(2)(C) (1982), "where a pesticide chemical has been used in or on a raw agricultural commodity in conformity with an exemption granted or a tolerance prescribed ... and such raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating, or milling, the residue of such pesticide chemical remaining in or on such processed food shall ... not be deemed unsafe if such residue in or on the raw agricultural commodity has been removed to the extent possible in good manufacturing practice and the concentration of such residue in the processed food when ready to eat is not greater than the tolerance prescribed for the raw agricultural commodity...." See also 40 C.F.R. § 180.1(f) (1983); 21 C.F.R. § 170.19 (1983). The judge relied on § 342(a)(2)(C) as passing through to processed food the exemption from the requirement of a tolerance for EDB on raw grains. The provision does not apply, however, where EDB is used in or on grain-mill machinery as opposed to being used on the raw grain after harvest. Residues of EDB resulting from use on grain-mill machinery are not exempted from the requirement of a tolerance. Since EDB has been used widely on grain-mill machinery, see 49 Fed. Reg. 4454 (1984), the department's regulation, which sets an action level for EDB in food regardless of the stage at which the pesticide was applied, is not wholly inconsistent with the Federal scheme, even if an exemption is considered to be a tolerance.
[9] Nor do we believe that an exemption from the requirement of a tolerance is a standard or a definition of purity, quality, or identity for food within the meaning of G.L.c. 94, § 192. See, e.g., G.L.c. 94, §§ 12, 77A, 90D, 142, and 163.
[10] Before the 1948 amendment, G.L.c. 94, § 192, provided in pertinent part: "The department of public health ..., except as to standards fixed by law, ... shall adopt rules and regulations, consistent with [§§ 186-195 of c. 94], standards, tolerances and definitions of purity or quality, conforming to the rules and regulations, standards, tolerances and definitions of purity or quality adopted or that may hereafter be adopted for the enforcement of the act of congress approved June thirtieth, nineteen hundred and six, and the amendments thereof, the said act being entitled `An Act for preventing the manufacture, sale or transportation of adulterated or misbranded or poisonous or deleterious foods, drugs, medicines, and liquors, and for regulating traffic therein and for other purposes', or now or hereafter adopted by the United States department of agriculture under any other federal law" (emphasis supplied).

The 1948 amendment dropped the reference to Federal "rules and regulations" and added the words "if any" referred to in the text. The 1948 amendment also substituted the reference to the food, drug, and cosmetic act now contained in the section and deleted the former reference to the department of agriculture.
[11] Section 408 of the Federal act is 21 U.S.C. § 346a (1982). Section 408 provides that the use of poisonous or deleterious pesticide chemicals on raw agricultural commodities shall be unsafe unless the pesticide chemical has been exempted under § 346a from the requirement of a tolerance, or a tolerance has been prescribed under § 346a, and the quantity of the chemical is within the limits of the tolerance. Under Environmental Protection Agency regulations, EDB is a poisonous or deleterious pesticide chemical. See 40 C.F.R. § 180.2(a) (1983).
[12] The plaintiff has argued on appeal, though it did not make the claim in its complaint, that the regulation is in violation of § 186 of c. 94, as well as § 192, in that it defines the adulteration of food in a stricter way than Federal law defines it, but does so by way of an action level or tolerance rather than a ban on the use of EDB. This argument is clearly invalid, since § 186 does not limit its definition of adulterated food to food which is adulterated within the meaning of the Federal act.

For instance, an article of food is to be deemed adulterated under G.L.c. 94, § 186, "if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health."
[13] See note 7, supra.
[14] On February 3, 1984, the Administrator of the EPA, William D. Ruckelshaus, suspended the registrations of products containing EDB and labeled for use to fumigate stored grain and to treat grain milling equipment; he also recommended maximum permissible residue levels of EDB in grain and grain products. 49 Fed. Reg. 4452, 4455 (1984). (These recommended levels were not "adopted," as is required for them to be binding on the department under G.L.c. 94, § 192.) The plaintiff's counsel conceded at oral argument that the Administrator took this action because of the view that the assumption expressed in 40 C.F.R. § 180.3(c)(2)(1983) is no longer scientifically valid.
[15] General Laws c. 17, § 2A, inserted by St. 1965, c. 473, provides: "Upon declaration by the governor that an emergency exists which is detrimental to the public health, the commissioner may, with the approval of the governor and the public health council, during such period of emergency, take such action and incur such liabilities as he may deem necessary to assure the maintenance of public health and the prevention of disease.

"The commissioner, with the approval of the public health council, may establish procedures to be followed during such emergency to insure the continuation of essential public health services and the enforcement of the same.
"Upon declaration by the governor that such emergency has terminated, all powers granted to and exercised by the commissioner under this section shall terminate."
[16] The Department of Public Health consists of the Commissioner of Public Health and the Public Health Council. G.L.c. 17, § 1.
[17] There is nothing in the language of § 2A to support the plaintiff's claim that all emergency actions of the department which are directed toward the maintenance of public health and the prevention of disease must be taken pursuant to that section.
[18] Such a transfer of power would be inconsistent with the division of functions between the Commissioner and the Public Health Council effected in G.L.c. 111, §§ 2 and 3.
[19] See G.L.c. 94, § 192, and the first four paragraphs of G.L.c. 30A, § 2.
[20] The plaintiff also claims that the adoption of the regulation without notice and hearing violated the Fourteenth Amendment to the Constitution of the United States. It does not claim, however, that the department's action in adopting the regulation was adjudicatory in nature. It is well settled that, where a proceeding is legislative or political rather than adjudicatory, a hearing is not essential to due process under the Fourteenth Amendment to the Constitution of the United States or under art. 10 or art. 12 of the Declaration of Rights. Cast Iron Soil Pipe Inst. v. State Examiners of Plumbers & Gas Fitters, 8 Mass. App. Ct. 575, 587 (1979). Hayeck v. Metropolitan Dist. Comm'n, 335 Mass. 372, 375 (1957). See United States v. Florida E. Coast Ry., 410 U.S. 224, 244-245 (1973).
[21] The dissenters, however, seem to rely on a view that the department's choice of a 1 ppb standard was unsound in reaching their conclusion that no emergency existed. In support of this view, they quote a statement by one Dr. Gordon W. Gribble (without citation to the locus of such alleged comments). See infra at 330-331. This statement was not made or quoted at the February 6, 1984, meeting of the Public Health Council at which it adopted the regulation. Nor was the material on which the dissenters rely put before the motion judge. It does not appear anywhere in the record or briefs before this court. What action level for EDB in food is necessary to protect public health is a question of disputed scientific fact. The dissenters are unjustified both in allowing their opinion on that question to influence their decision in this case and in paying heed in their decision to a statement from an outside source whose authoritativeness is not established.
[22] An emergency regulation cannot remain in effect for longer than three months, however, "unless during that time the agency gives notice and holds a public hearing as required in this section, and files notice of compliance with the state secretary." G.L.c. 30A, § 2.
[23] Although we have concluded that the plaintiff has no likelihood of success on the merits, we discuss the issue of irreparable harm because we touched on it in our February 14 order.
[24] We question whether the plaintiff has standing to complain of a rise in consumer prices either nationally or in Massachusetts. The members of the American Grain Products Processing Institute are companies which manufacture and process grain-based food products. Since the plaintiff has not shown irreparable harm, however, we need not reach the question of standing.
[25] Also, raw products and processed products which require cooking before consumption can be treated in various ways so as to reduce their EDB content greatly.
[26] A brief amicus curiae submitted at oral argument by the Grocery Manufacturers of America, Inc., seeks to raise the argument that State action is preempted by the commerce and supremacy clauses of the Constitution of the United States as well as by Federal statutes and regulations. The amicus cites U.S. Const. art. I, § 8, cl. 3; art. VI, cl. 2; 21 U.S.C. §§ 342, 346a (1982), and 40 C.F.R. §§ 180.146, 180.1006 (1983). The plaintiff did not raise the Federal preemption claim before the motion judge or in its brief and argument before us. The issue is not before us, and we do not address it.
[1] The majority points out that this statement was not made or quoted before the meeting of the Public Health Council on February 6, 1984. That is the point. By using the "emergency" mechanism to avoid the public hearing requirements the department has effectively suppressed the expression of any opinion by interested members of the public. The record of that hearing shows that the discussion was limited to staff and council and that the attorney who represents the plaintiff was present but was not allowed to make a presentation. Such a procedure will always result in a record devoid of assistance to those whose views fail to coincide with those of the agency.
[2] I also disagree with the majority's holding, ante at 321-322, that the provisions of G.L.c. 30A, § 2, and G.L.c. 17, § 2A, can be reconciled. While the former applies to administrative agencies generally, the latter sets out a specific procedure for the issuance of emergency regulations by the department of public health. Clearly, the more specific statute supersedes the more general. Pereira v. New England LNG Co., 364 Mass. 109, 118 (1973). The assertion that the two statutes can be reconciled because G.L.c. 30A, § 2, addresses emergency actions taken by the department is contrived and unconvincing. Emergencies which affect the public health are qualitatively different from other types of administrative emergencies. Many times emergency regulations are issued because an existing regulation is found to be invalid and a temporary rule is needed until the invalid one can be redrafted. See, e.g., Pioneer Liquor Mart, Inc. v. Alcoholic Beverages Control Comm'n, 350 Mass. 1 (1965). Emergencies which involve the department of public health, on the other hand, involve serious and immediate risk to human life and health, and emergency regulations (as in this case) tend to involve the outright removal of some dangerous substance from public access, at great expense to somebody. It is not unreasonable for the Legislature to have decided that such drastic action not be taken without the approval of the Governor.