JENNIE N. RUGGIERO *vs.* STATE LOTTERY COMMISSION.

Suffolk.  February 7, 1986. — March 11, 1986.

Present: GREANEY, C.J., WARNER, & FINE, JJ.

*State Lottery Commission. Contract,* Lottery ticket.

In an action by a participant in the State lottery for review of a decision of
the State Lottery Commission, brought under G. L. c. 30A, § 14, claim-
ing that she had won a $100,000 prize in the "Instant Holiday Jackpot
Game," the commission's decision denying the plaintiff's claim to the
prize, based on its determinations that her lottery ticket, with double
imprints of the prize amounts, was defective and that it failed the lottery
validation requirement, was supported by substantial evidence in the
record, was not based upon an error of law, and was otherwise proper;
consequently, there was no basis for a judgment of the Superior Court
which set aside the commission's decision and ordered payment of
$100,000 to the plaintiff. [688-691]

CIVIL ACTION commenced in the Superior Court Department
on August 29, 1983.

The case was heard, on a master's report, by *Thaddeus
Buczko,* J., sitting under statutory authority.

*John F. Boyle, Jr.,* Special Assistant Attorney General
(*James F. Driscoll,* Special Assistant Attorney General, with
him) for the defendant.

*Edward J. Quinlan* (*Mary E. Davey* with him) for the plain-
tiff.

FINE, J. Jennie N. Ruggiero, the plaintiff in this action for
review of a decision of the State Lottery Commission (commis-
sion), brought under G. L. c. 30A, § 14, claims that she won
a $100,000 prize in the "Instant Holiday Jackpot Game"
(game). We think the commission's decision denying Rug-
giero's claim to the prize ought to be upheld, and we therefore
reverse the judgment of the Superior Court which set aside the
commission's decision and ordered payment of $100,000 to
Ruggiero.

We summarize the evidence presented at the administrative hearing before a member of the commission. In December of 1982, Ruggiero purchased two tickets to the game for $1 apiece. Each ticket has six boxes (or "packages") on the front. Also on the front are the instructions, "Rub all six packages. Match three and win that prize." On the back of the ticket is a form to be filled in by a person claiming to be a winner of a prize, and, in addition, the following under the heading, "RULES":

> "Ticket void if not in conformance with Lottery Rules, mutilated, altered, unissued, stolen, reconstituted, miscut, or defective, if "VOID IF REMOVED" covering is removed or ticket fails any lottery validation requirement OR if numbers do not appear in each designated position. No more than one prize per ticket.

> "When claiming a prize of $500 or more, retain this portion as your receipt.

> "The Holiday Jackpot flyer contains rules on prizes, approximate odds and how to win. When you win, see your Lottery sales agent for redemption instructions, $100,000 prizes paid $10,000 per year for 10 years.

> "Do not accept ticket if altered in any way.

> "ALL WINNERS TICKETS AND TRANSACTIONS SUBJECT TO LOTTERY COMMISSION RULES."

Emergency Rules and Regulations of the commission, 961 Code Mass. Regs. § 2.31(7), were adopted on November 1, 1982, and filed with the State Secretary for the purpose of

> "[setting] forth all of the applicable rules governing the sale of tickets for the Instant Holiday Jackpot Game, the payment and amount of prizes, how winners are selected, how disputes are resolved and the various procedures to determine the validity of a winning ticket."

The nature of the emergency was stated to be "[p]ublic welfare and to preserve and maximize the revenue of the Commonwealth." The emergency regulations described in general how

the game was to be played: the player rubs off all the spots in the six boxes. When the surface was rubbed off, printed in each box was a reference to a prize ranging from a "free ticket" to $100,000. A match of three prizes entitled the ticket holder to that prize. Among the requirements for valid tickets were the following: "The ticket must . . . have exactly one Play Symbol under each of the six (6) rub-off spots . . .," 961 Code Mass. Regs. § 2.31(7) (6) (a) (5), and the "Validation Numbers . . . must correspond, using the Lottery's codes, to the apparent Play Symbols and Prize Amounts on the ticket." 961 Code Mass. Regs. § 2.31(7) (6) (a) (8). The regulations provided further that "[a]ny ticket not passing all the validation checks in this part is void and ineligible for any prize and shall not be paid. However, the Director may, solely at his option, replace an invalid ticket with an unplayed ticket . . . . In the event a defective ticket is purchased, the only responsibility or liability of the Lottery shall be the replacement of the defective ticket with another unplayed ticket . . . ." 961 Code Mass. Regs. § 2.31(7) (6) (b).

When Ruggiero rubbed the boxes on the ticket in question, some of the boxes contained double imprints of the prize amounts. Although "$100,000" appeared in three boxes, two of those boxes had imprints of both "$100,000" and another prize, one printed over the other. Ruggiero applied for the $100,000 prize but was notified that the ticket was determined to be defective, and she was supplied with a substitute ticket. A check by the commission with the manufacturer revealed that the disputed ticket had been misprinted. Accordingly, it was not validated as a winning ticket.

The commission found the facts in accordance with the evidence and ruled that Ruggiero was not entitled to the prize because the ticket was defective, it was not validated by the game manufacturer, and it did not comply with the applicable regulations.

Other than the record of proceedings before the commission,[1] no evidence was presented in Superior Court. Nevertheless,

---

[1] The hearing was conducted by one member of the commission, who made written findings and rulings. The full commission subsequently ratified and adopted those findings and rulings.

the judge found that the ticket was not defective, that the commission's emergency regulations were not validly promulgated under G. L. c. 30A, § 3, because they were not supported by an adequate statement of emergency, and that, even if the regulations were in force, Ruggiero was not bound by any limitation in the regulations or on the ticket because the contract was one of adhesion and she had no actual notice of the limitations.

The commission's determinations that the ticket in question, with double imprints of the prize amounts, was defective and that it failed the lottery validation requirement were supported by substantial evidence in the record. We have examined the main item of evidence, the ticket, and, not only do we view the commission's finding that the ticket was defective as not clearly erroneous, but we unequivocally would reach the same conclusion. According to the rules stated on the back of the ticket, a defective or unvalidated ticket is void. Those rules do not appear to us to be unreasonable or unfair. They appear in simple language and in a location on the card where they are likely to be read. A person playing a game such as the Instant Holiday Jackpot Game ought to be aware of the fact that there are rules for playing it and that his rights are limited by those rules. Without rules there would be no assurance that the game would be conducted in an orderly way, that winners would be treated fairly, that the Commonwealth would be protected against false or fraudulent claims, or that the anticipated revenue would be produced. The commission was acting within its statutory authority in adopting the rules for the game. G. L. c. 10, § 24. Contrary to what the trial judge determined, we think that the ticket provided a player with reasonable notice of the pertinent rules. Thus, based upon the ticket alone, viewing it as in essence a contractual arrangement between Ruggiero and the commission (see *Coleman* v. *State,* 77 Mich. App. 349, 351 [1977]; *Van Gulick* v. *Resource Dev. Council for Alaska, Inc.,* 695 P.2d 1071, 1073 [Alaska 1985]; Annot., Private Rights and Remedies Growing Out of Prize Winning Contests, 87 A.L.R. 2d 649, 661 [1963]), she was not entitled to collect the prize.

We have said nothing thus far in our discussion about the emergency regulations found by the Superior Court judge not to have been validly promulgated. If the regulations were validly promulgated, the ticket purports to incorporate them by reference in the contract. Since nothing in those regulations is in any material way inconsistent with the operative language on the back of the ticket, we are not called upon to decide whether they were validly promulgated[2] or whether the reference to them on the ticket effectively incorporates them in the contract by reference.

---

[2] General Laws c. 10, § 24, as amended through St. 1979, c. 790, § 1, authorizes the commission to conduct a State lottery and to determine how it is to be conducted. To that end, the commission "may establish, and from time to time revise, such rules and regulations as it deems necessary or desirable and shall file the same with the office of the state secretary." The commission adopted permanent regulations (961 Code Mass. Regs.) which included § 2.31, providing rules for instant games. Those rules provided that a ticket is void if more than one number or symbol appears in each play number designated area, if the ticket is part of a printing error, or its validation code does not correspond with the apparent image or lack of image. According to those regulations, the rules may be "amended from time to time by emergency regulations governing a specific instant game." 961 Code Mass. Regs. § 2.31 (1978). The emergency regulations in issue were adopted for the specific instant game to be conducted in late 1982 pursuant to that reference in the permanent regulations. Each instant game lasts for a short period, usually thirteen weeks. General Laws c. 30A, § 3, as appearing in St. 1976, c. 459, § 3, requires notice and an opportunity to be heard before a regulation is adopted unless "the immediate adoption, amendment or repeal of a regulation is necessary for the preservation of the public health, safety or general welfare, and that observance of the requirements of notice and affording interested persons an opportunity to present data, views, or arguments would be contrary to the public interest." The justification stated for dispensing with the notice and hearing requirement for the instant game regulations at issue was not elaborate. However, considering the limited substantive effect of the emergency regulations (contrast *American Grain Prods. Processing Inst.* v. *Department of Public Health,* 392 Mass. 309 [1984]; *Grocery Manufacturers of America, Inc.* v. *Department of Pub. Health,* 379 Mass. 70 [1979]), the comprehensive permanent regulations for which the emergency regulations provide merely the details about the game, and the short period during which each successive instant game is played, the commission appears clearly to have acted in good faith in adopting the emergency regulations, and it has not sought to use the process as a subterfuge to evade the statutory requirements. *Pioneer Liquor Mart, Inc.* v. *Alcoholic Beverages Control Commn.,* 350 Mass. 1, 9 (1965). *Robinson* v. *Secretary of Admn.,* 12 Mass. App. Ct. 441, 450 (1981).

Since the decision of the commission was supported by substantial evidence, was not based upon an error of law, and was otherwise proper (G. L. c. 30A, § 14[7]), there was no basis for setting it aside.

*Judgment reversed.*