**Paul V. VALENTE**

v.

**RHODE ISLAND LOTTERY COMMISSION et al.**

No. 87–317–A.

Supreme Court of Rhode Island.

July 21, 1988.

---

Kenneth R. Tremblay, Tremblay & Gorton, Portsmouth, for plaintiff.

John P. Hawkins, Hawkins & Hoopis, Providence, for defendants.

## OPINION

SHEA, Justice.

This case is before the Supreme Court on appeal from a judgment for the plaintiff entered following a jury verdict in the Superior Court. The defendants are the Rhode Island Lottery Commission (commission), the director of the Lottery (director), and the commissioners of the Rhode Island Lottery (Lottery). The defendants raise two grounds for appeal: the trial justice erred in denying the defendants' motion for a directed verdict and the trial justice incorrectly instructed the jury concerning the right of the director to validate winning tickets. We reverse.

This case involves the "Play Ball" instant-lottery game, a popular game sponsored by the commission. The rules of the game are quite simple. In the upper-right corner of the ticket is a square or box covered by a thin layer of latex. The ticket holder rubs this box with a coin in order to learn how much money he or she is playing for. Along the bottom of the ticket there are nine latex-covered boxes, each representing a baseball inning. The ticket holder rubs these boxes to reveal how many "runs" the player has scored. Finally in the bottom-right corner there is a latex-covered box that covers the "opponent's score." If the ticket holder's total number of runs is greater than or equal to the opponent's score, the ticket holder has won the prize amount indicated.

According to plaintiff's testimony, in May of 1976 he was a fulltime civilian-service employee of the fire department working at Otis Air Force Base. On the evening of May 12 plaintiff and several other firefighters went to the Portsmouth Fire Department after taking exams at Bristol Community College. At the fire station, plaintiff purchased several Play Ball tickets from one of the firefighters who had previously purchased a stack of tickets. After playing several tickets including a $5 winner and several losing tickets, plaintiff played the ticket at issue in the case. First, he scratched the nine inning boxes, which revealed that he had scored one run. Next, he scratched the "opponent's score," which, he stated, "appeared to be a 1." Finally, he scratched the box in the upper-right corner that revealed that the ticket, if it was a winner, was worth $10,000. He stated, and several of the firefighters corroborated, that he scratched the card in the presence of the firefighters and then immediately, in his excitement, passed the card around to the other firefighters.

Photographs of the ticket at issue were introduced at trial.[1] These photographs revealed that the numeral that plaintiff had stated "appeared to be a 1," was blurred and ambiguous.

On the morning of May 13 plaintiff brought his ticket to the Lottery headquarters to claim his prize money. There he was told that the ticket would have to be validated and that he should call the following day. The following day he called the Lottery and was informed that the ticket was not programmed to be a winner and that the Lottery was willing to pay him back the dollar he had paid for the ticket or give him a new ticket. The offer was not accepted.

1. A State Police officer testified that sometime in May 1976 plaintiff's lottery ticket was turned over to the State Police for investigation of possible ticket tampering. He stated that the State Police could not locate the ticket for this trial.

Shortly thereafter plaintiff was arraigned on criminal charges for altering a lottery ticket. However, those charges were dismissed prior to trial.

The director testified that the Lottery had an internal-security system in effect that was comprised of four validation tests that were applied to validate winning tickets. The first validation test was a "visual test." On each ticket there is a so-called VIRN number (or a void-if-removed number) covered with latex. The VIRN number contains eight digits. The visual test was accomplished by adding the last three digits of the VIRN number, plus the total amount of runs scored by the ticket holder, plus the opponent's score. The total of these factors would always end in either a numeral two or a numeral eight. According to the director, "If it ends in a two, it's a loser. If it ends in an eight, it's a winner." The second validation test requires looking up the VIRN number in the so-called VIRN book. The director explained that "this book contains every VIRN number and the total game. We go to [the] VIRN book, look up the number on the ticket and it will show exactly what [the numbers were] in the runner's innings, the opponent's score, and also what the prize is." The third validation test regenerated a ticket by punching into a computer certain information contained on the ticket. The final test required retrieving and observing the original plate from the printing press where the ticket was printed. The director testified that all four of these tests were performed on plaintiff's ticket, and they revealed that plaintiff's ticket was a losing ticket.

The director further testified that it was his opinion that the ticket had been altered. He said that "something [had] been erased, and some other type of ink had been added into the opponent's score."

A lottery consultant and manager of software development for the ticket-printing process testified that "the probability of accuracy [of the validation tests in combination] is one hundred percent."

At the completion of the evidence defendants moved for a directed verdict on the ground that under the rules stated on the lottery ticket, under the authority granted to the commission under the State Lottery statute, and also under the rules and regulations promulgated by the commission, winning tickets are void if they fail a Lottery validation test or if they are "mutilated." The defendants' motion was denied.

On appeal, defendants claim that the trial justice erred in denying the motion for a directed verdict. They argue that the evidence, when viewed in a light most favorable to plaintiff, showed that plaintiff's ticket did not meet the Lottery's validation requirements. They assert that the rules stated on the back of the ticket clearly and unambiguously required validation as a condition for a ticket's being declared a winner. The writing on the back of the ticket referred to by defendants states, "Tickets void if illegible, mutilated, counterfeit, altered, unissued, reconstituted, if 'void if removed' covering is removed, if printed or produced in error, *or if ticket fails any validation requirement*." (Emphasis added.)

The defendants contend that the State Lottery statute and the rules and regulations promulgated by the commission gave them the authority to determine whether plaintiff's ticket was a winner. They refer the court to G.L. 1956 (1977 Reenactment) §§ 42–61–2 and 42–61–4, which state in pertinent part:

"42–61–2. Commission—Powers and duties.—The commission shall meet with the director * * * for the purpose of promulgating and reviewing rules and regulations relating to the lotteries, to make recommendations and set policy for lotteries, to approve or reject actions of the director and to transact other business that may be properly brought before said commission.

The rules and regulations promulgated by the commission shall include but not be limited to:

\*     \*     \*     \*     \*     \*

(4) The manner of selecting the winning tickets or shares[.]"

"42–61–4. Director—Powers and duties.—The director shall have the power and it shall be his duty to:

(1) Supervise and administer the operation of lotteries in accordance with this chapter and with the rules and regulations of the commission."

Finally, defendants refer the court to several provisions of the Rhode Island Lottery Commission Rules and Regulations filed with the Secretary of State on December 4, 1974, including the following:

"1.5 Erroneous or mutilated tickets.

(a) Lottery tickets made out in error or mutilated in any way are required to be voided by the Agent and the lottery Director immediately notified.

\* \* \* \* \* \*

(c) Unless a mutilated ticket is proven to the satisfaction of the Director to be genuine, no final credit will be issued.

(d) A holder of a mutilated lottery ticket can win a prize as long as that ticket can be identified as a valid ticket and the lottery number, the lottery security control number, and the lottery drawing date, all are legible and validated. Members of the general public can only receive prize credit from the Director."

The trial justice denied the motion for a directed verdict on the ground that a fact question existed in regard to what the rules of the game were. The trial justice stated that this fact issue was created by the commission's noncompliance with § 42–61–2(15), which states in pertinent part, "The rules and regulations promulgated by the commission or any amendments, revisions, supplements or repeal thereof, shall be forthwith transmitted, and under the certification of the executive secretary thereof, to the secretary of state for filing." He held that the Rhode Island Lottery Commission Rules and Regulations filed with the Secretary of State on December 4, 1974, only applied to the original lottery game, a game in which numbers were drawn. These rules and regulations did not apply to instant games. He based this ruling on the language of § 1.5(d) of the rules and regulations, quoted above. He explained that the three stated means

for determining a valid lottery ticket, namely, a legible and validated lottery number, security control number, and lottery drawing date, applied only to lottery drawings, not to instant games. He stated:

"[T]he rules spelled out on the back of the ticket contain a provision with regard to validation as part of the rules of the game \* \* \* I think there is a fair factual question in this case as to what are the rules of this game, since the rules on the back of the ticket have not been filed with the Secretary of State and it cannot be given the weight of substantive law as if it were an enactment of the General Assembly. To do that, in a way \* \* \* would be sneering at the members of the [1974] General Assembly \* \* \* . Clearly, [the Legislature intended] that to be a meaningful Act."

We believe the intention of 1974 Legislature in requiring the rules and regulations to be filed by the commission with the Secretary of State, aside from setting out its own administrative structure and procedures, was to clarify ambiguities in any of the rules written on the ticket and to provide notice to consumers of any rules not written on the ticket owing to space constraints.

■ We do not believe that the commission was under any obligation to give notice to consumers of the exact methods it uses for validating tickets. The commission might find it necessary to keep its internal security system private in order to make alteration and counterfeiting of tickets more difficult.

■ Several of our sister states have held that "[a] lottery winner's entitlement to a prize is governed by the principles of contract law." *Coleman v. Bureau of State Lottery,* 77 Mich. App. 349, 351, 258 N.W.2d 84, 86 (1977). *See also Ruggiero v. State Lottery Commission,* 21 Mass. App. 686, 489 N.E.2d 1022 (1986); *Fujishima v. Games Management Services,* 110 Misc. 2d 970, 443 N.Y.S.2d 323 (1981). We agree and therefore hold that the Play Ball ticket was a contract.

Accordingly we find that the one-sentence paragraph on the back of the ticket stating, "Tickets void * * * if ticket fails any lottery validation requirement," was a condition of the contract. It was clear and unambiguous.

In *Marcotte v. Harrison*, 443 A.2d 1225, 1229 (R.I. 1982), we discussed our standard of reviewing a trial-court decision on a motion for a directed verdict.

"In considering a motion for a directed verdict, this court must do what the trial justice is called upon to do in the first instance. We examine the evidence and all inferences reasonably flowing therefrom in the light most favorable to the nonmoving party. We do not consider the credibility of the witnesses or the weight of the evidence. We then determine whether * * * there is evidence for the jury to consider which would warrant a finding in favor of the nonmoving party. If we conclude that there is evidence supporting that party or that there is evidence on which reasonable minds could differ, then the jury is entitled to decide the facts of the case."

Drawing all inferences in a light most favorable to plaintiff, we find that the ticket could not be declared a winner because it had failed a condition of the contract. The evidence was uncontradicted that the Lottery applied all four of its validation tests on the ticket and determined it was a losing ticket. Because plaintiff failed to allege a defense to the contract, there was no evidence upon which reasonable minds could differ entitling the case to go to the jury. Accordingly, we hold that the trial justice should have granted defendants' motion for a directed verdict.

Because our reversal of the trial justice's denial of the defendants' motion for a directed verdict is dispositive of the case, we shall not address the defendants' second issue on appeal concerning the trial justice's instructions to the jury.

For these reasons the defendants' appeal is sustained, the judgment appealed from is reversed, and the papers of the case are remanded to the Superior Court for entry of judgment for the defendants.