ROBERT C. JACOBS *vs.* STATE LOTTERY COMMISSION.

No. 01-P-1669.

Suffolk. May 9, 2003. - January 8, 2004.

Present: DUFFLY, CYPHER, & COHEN, JJ.

*Lottery. State Lottery Commission. Contract,* Lottery ticket, Offer and acceptance. *Advertising.*

In a civil action in which the plaintiff, who purchased an instant lottery ticket that, on its face, entitled him to a $10 prize, sought to collect $4,001,350, on the basis of a mistake contained in lottery advertising, a Superior Court judge properly affirmed the decision of the State Lottery Commission (Lottery) to deny the plaintiff's claim, in that the terms of the contract between the plaintiff and the Lottery were the ones printed on the actual ticket the plaintiff purchased; moreover, the Lottery's determination that the plaintiff had not relied on the incorrect information in lottery advertising when he purchased the ticket was supported by substantial evidence in the record. [305-308]

CIVIL ACTION commenced in the Superior Court Department on July 14, 2000.

The case was heard by *John C. Cratsley, J.,* on motions for judgment on the pleadings.

*John L. Kerr* for the plaintiff.

*Maria Makredes,* Assistant Attorney General, for the defendant.

DUFFLY, J. Robert Jacobs purchased an instant lottery ticket that, on its face, entitled him to a $10 prize, but, on the basis of a mistake contained in lottery advertising, he sought to collect a cash prize in the amount of $4,001,350. The State Lottery Commission (commission) denied Jacobs's claim. The Superior Court affirmed the commission's decision following its review in accordance with G. L. c. 30A, § 14. We affirm.

1. *Background.* The commission introduces several new instant games per year, each running for approximately thirteen

weeks. On November 6, 1996, the commission, through its lottery ticket sales agents, began selling tickets to its new "Holiday Bonus" instant game. The tickets were of the "scratch" variety; a player rubs off a coating on a ticket to reveal winning numbers, words, or symbols. Printed on the tickets at issue here were rules that provided in part as follows: "Get a ★ symbol and win prize shown automatically." However, promotional materials provided to the sales agents for public display — wall posters and countertop change mats — showed this incorrect rule: "Get a ★ symbol, win all ten prizes automatically."[1] Before the Holiday Bonus tickets went on sale, the commission had issued Administrative Bulletin No. 105, also containing the incorrect rule.[2]

Soon thereafter, lottery officials discovered the mistake and took remedial measures. On November 15 and 16, 1996, they notified lottery sales agents of the error by issuing Special Report 70 through online computer terminals, instructing agents to remove all Holiday Bonus change mats and posters.[3] At the same time, the commission also issued Administrative Bulletin No. 105A, which amended the previous bulletin to correct the

---

[1]The sample Holiday Bonus tickets shipped to the commission by the printer in September, 1996, contained the incorrect rule. The error on the tickets, however, was caught and corrected prior to the first shipment to the sales agents. The "win all prizes shown" rule was intended to apply solely to the "Wild 25" game, another new game introduced on the same day as the Holiday Bonus game.

[2]The general rules then in force for instant games appear at 961 Code Mass. Regs. § 2.31 (1996). Prior to 1995, lottery officials issued the rules governing particular instant games through emergency regulations (see G. L. c. 30A, § 3) that automatically expired after ninety days. In 1995, pointing out the logistical difficulties in this system, the regulations division of the Office of the Secretary of State recommended the issuance of rules for specific games as administrative bulletins. That office opined that the change would not violate G. L. c. 10, § 24, as long as the general regulations in § 2.31 were maintained. Lottery officials apparently agreed with the assessment. In June, 1996, after proper notice and a public hearing, the commission amended 961 Code Mass. Regs. § 2.31(4)(p) to reflect the change (ticket is void if "[i]t fails to meet any requirement contained in the Administrative Bulletin issued by the Director [of the State Lottery] for any particular Instant Game"). Neither administrative bulletin at issue in this case was filed with the Office of the Secretary of State or published in the Massachusetts Register. In view of our decision, we do not reach the issue whether the lack of filing or publication violates G. L. c. 10, § 24.

[3]Special reports are sent electronically to the agents' point-of-sale terminals.

rule relating to the star symbols. In addition, during internal meetings on November 18 and 19, 1996, the commission instructed all of its regional sales representatives that on the next visit to sales locations in their territories they were to redact the incorrect information from the posters and change mats.

Unfortunately, a change mat with the incorrect information remained in place at the Route 9 Beer and Wine store in Southborough, where Jacobs made a purchase of Holiday Bonus tickets. On one of the tickets, he uncovered a ★ symbol. The prize reflected in the space with the ★ symbol was $5. In another space on that ticket, he uncovered a winning number also reflecting a $5 prize. An agent validation code, which appears on each ticket and allows a sales agent to determine that ticket's value, established that the total prize for Jacobs's winning ticket was $10. Jacobs claimed entitlement to the combined value of all ten prizes shown on the ticket, $4,001,350. Upon review of the language on Jacobs's ticket, Murray, the counter clerk, disagreed with Jacobs's assessment and handed the ticket back. Jacobs left with the disputed ticket and the change mat setting forth the incorrect rule.

Jacobs first submitted his claim form to the commission one and one-half years later, on April 9, 1998. The claim was thereafter denied and Jacobs pursued various administrative avenues,[4] culminating, on March 1 and 3, 2000, in hearings before a designee of the commission chairwoman (also the State Treasurer). Findings and rulings thereafter issued denying the claim. After the full commission adopted that decision, Jacobs sought review in Superior Court, where the commission's motion for judgment on the pleadings was allowed. This appeal followed.

2. *Discussion.* The commission found facts in accordance with the evidence and ruled that, with respect to the ★ symbol, Jacobs was not entitled to the prize amount he claimed because the ticket rules, as set forth on the ticket he had purchased,

---

[4]Jacobs filed a timely request for reconsideration of the denial of his claim. Following an informal hearing before the acting executive director of the commission, the denial was affirmed. Jacobs then timely requested a hearing before a member of the commission.

entitled him only to the $5 prize amount shown in the space with the symbol, and not to all of the dollar amounts reflected in the other spaces on the ticket.

It was up to the hearing officer to determine the circumstances under which the ticket was sold. The hearing officer expressly discredited the testimony of Jacobs and Murray that was to the effect that Jacobs, asking about any new games, had closely inspected the change mat and relied on the incorrect rule in making his decision to purchase two Holiday Bonus tickets.

In discrediting the testimony of Murray, the hearing officer found that Murray knew Jacobs from his regular visits to the Route 9 Beer and Wine store, where Jacobs frequently purchased substantial amounts of lottery products, buying between twenty and eighty dollars in tickets at a time. Furthermore, based on the activation date of the disputed ticket, Jacobs could not have purchased it until at least December 24, 1996,[5] almost two months after the introduction of the Holiday Bonus instant game. The hearing officer concluded that, contrary to Murray's testimony, the Holiday Bonus game, introduced on November 6, "could hardly be said to be a 'new' product" at the time of Jacobs's purchase, and he did not credit the testimony that Jacobs had asked Murray if there were any new lottery products before his purchase of the disputed Holiday Bonus ticket. The hearing officer also concluded that "in light of the paucity of claims to the Lottery regarding the advertising of the Holiday Bonus instant game, especially given the number of tickets sold [28 million as of November, 1997], Mr. Murray's credibility is diminished by his testimony about the number of complaints that he personally had received."

The hearing officer found that Jacobs had initially made the claim to the commission that he purchased the ticket in early November, 1996, and that it was in Jacobs's interest to claim he had purchased the ticket prior to November 15, 1996, during a period when the incorrect Administrative Bulletin No. 105 (sup-

---

[5]Uncontradicted testimony credited by the hearing officer describes the following procedure: when a book of instant lottery tickets is unwrapped for sale, the sales agent "activates" the book by means of an electronic scan. The date of activation is thereby reported to and maintained by the commission's computers. In this case, the activation date of the book containing the disputed ticket was December 24, 1996.

porting Jacobs's claim to $4,001,350) was still in effect. The hearing officer found that it was only after it was demonstrated that Jacobs could not have made the purchase prior to December 24, 1996, that he changed his position as to when he had made his purchase, and that this self-serving adjustment to the time frame cast serious doubts on Jacobs's credibility. The hearing officer determined that Jacobs had not relied on the incorrect information on the change mat when he purchased the Holiday Bonus ticket. He also found that Jacobs had left the mat and the ticket in his car overnight, behavior he viewed as inconsistent with Jacobs's claim that, in reliance on the language set forth on the mat, he was in possession of a multimillion dollar ticket. "The commission's determinations . . . were supported by substantial evidence in the record." *Ruggiero* v. *State Lottery Commn.*, 21 Mass. App. Ct. 686, 689 (1986).

The parties contest whether the commission may be contractually bound by the terms of the incorrect advertisement. See *Bretton* v. *State Lottery Commn.*, 41 Mass. App. Ct. 736, 741 (1996) (by purchasing a ticket, a party enters into a contract with the commission). The commission argues that, as a general rule, an advertisement is not considered an offer, but rather an invitation to make an offer or enter into a bargain. See 1 Williston, Contracts § 4:7, at 285-288 (4th ed. 1990 & Supp. 2003). Massachusetts courts have followed this rule in many contexts. See *Weinstein* v. *Green*, 347 Mass. 580, 582 (1964) (request for bids on real estate not an offer); *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. 363, 365-366 (1972) (quotation sent to plaintiff was not an offer).

We need not decide whether the language on the change mat was binding on the lottery commission. In light of the hearing officer's credibility-based determinations that Jacobs had not asked about any new games (and thus had no reason to be directed to look at the change mat), and that his purchase was not in reliance on anything set forth on the change mat, we think this case is controlled by the principles stated in *Ruggiero* v. *State Lottery Commn.*, 21 Mass. App. Ct. at 689. "According to the rules stated on . . . the ticket, [a ★ symbol would entitle the holder to the "prize shown"]. Those rules do not appear to us to be unreasonable or unfair. They appear in simple language

and in a location on the card where they are likely to be read. A person playing a game such as the [Holiday Bonus] [g]ame ought to be aware of the fact that there are rules for playing it and that his rights are limited by those rules. Without rules there would be no assurance that the game would be conducted in an orderly way, that winners would be treated fairly, that the Commonwealth would be protected against false or fraudulent claims, or that the anticipated revenue would be produced. The commission was acting within its statutory authority in adopting the rules for the game. G. L. c. 10, § 24. . . . [W]e think that the ticket provided a player with reasonable notice of the pertinent rules. Thus, based upon the ticket alone, viewing it as in essence a contractual arrangement between [Jacobs] and the commission . . . [he] was not entitled to collect the prize." *Ibid.* The terms of the contract were the ones printed on the actual ticket purchased by Jacobs, and pursuant to those terms, Jacobs was entitled to $10.

*Judgment affirmed.*